May it please the Court, Counsel. Good morning, my name is Lynn Shepard. I'm here representing Defendant Barton Buhtz. Our brief is organized chronologically in terms of when the different assignments of error occurred in the course of the case. However, I would like in addressing arguments today to start with our second assignment of error, which concerns the motion for a trial. Basically, that issue involves the unfairness of allowing a key prosecution witness, Rebecca Scholenberg, to withdraw her plea after she's testified, but allowing that testimony to remain as one of the basis for the convictions of Mr. Buhtz in this matter. Ms. Scholenberg's – analyzing Ms. Scholenberg's withdrawal of her plea involves two somewhat intertwined issues. What happened in this case, there were several codependents who were charged with passing fraudulent documents. They were part of what's sometimes known as the posse comitatus-type organizations, where they were tendering these bills of exchange. Ms. Scholenberg had been very involved in doing that. However, in negotiations with the government, she was allowed to plead guilty in exchange for a favorable which she did. As it turned out later, her counsel indicated that part of the consideration in her deciding to enter into that plea negotiation was her concern about getting a good-faith instruction in this case, which was sort of the basis of everyone's defense for the two remaining defendants that went to trial. After Mr. Buhtz was acquitted on a number of the charges, and after Mr. Scholenberg – Ms. Scholenberg's husband was acquitted on all the charges, Ms. Scholenberg tried to withdraw – well, successfully withdrew her guilty plea. This was based on a motion by her counsel indicating that she had mental issues that certainly raised questions about her credibility, and also because she wished to assert a good-faith defense to these. Basically – I understand the basic narrative. I mean, this is consistent with what's in the briefs and so on. I don't think this is much of a dispute. But what I don't understand is, why does this make the trial unreliable? Does it somehow mean that her testimony was false? Does it mean she otherwise would not have testified? I mean, what impact does this have on a new trial motion? Well, she was a very crucial issue to the government. She was the first of the lay issues that testified about how this – how these people dealt with these documents and what they were thinking when they provided those. She also had an extensive history of employment in the banking system. And she was also the government's last witness to talk about this situation. I basically know this, but I'm trying to figure out how – what's the basis for the new trial motion? Well, her testimony – well, it's sort of the two intertwined issues that I was starting to talk about. Number one is, it is a credibility issue. It definitely goes to her credibility. But also because – It goes to her credibility in what fashion? How does her – the assessment of credibility change once she's been allowed to withdraw her guilty plea? Oh, the new information that came about as a result of that withdrawal of her guilty plea. The new information – And what new information is that? About her mental – this mental illness or mental condition that she had that she could – it affected her ability to make determinations and to testify – or to honestly assert her position. Is there any claim that this mental illness came on after she pleaded guilty? No. Is there some – any reason why Mr. Buttes could not have found out about her mental illness by doing due diligence and investigating the character and veracity of the witnesses who were testifying against him? Well, someone's mental condition and counseling records obviously are privileged. They are? From what? From discovery in a criminal case? I mean, why couldn't Mr. Buttes have found out that Ms. Schoenberg had mental problems if she had them preexisting her testimony? Why – I mean, most of the new trial has to be done on newly discovered evidence that reasonable diligence would not have unearthed. We – it simply had never occurred to us to be something that would merit that – He dealt with Ms. Schoenberg, didn't he? He saw her. He knew her. Yes, he did. Could I also ask you – I guess the government's argument is that her testimony was largely cumulative. There's plenty of other testimony on the same point. But you indicate in your brief that one critical detail offered only by Rebecca Schoenberg was that at the seminar Mr. Buttes promoted drawing bills of exchange on U.S. Treasury direct accounts. And you said that that was a crucial point, but I didn't understand why. Can you explain that? Yes. The theory behind these documents is that someone is – that all of us have an account that exists because when the government went off the gold standard, we, in essence, the earning ability and the assets of our citizens now back the government currency. And that we, in essence, our security pledged to – pledged for that purpose. And they are attempting to, through a combination of commercial law and banking law, to put themselves in first position. So there is no – the Treasury direct accounts, to my understanding, are like checking accounts. And they do exist. Like we would have a checking account at a bank. There is – there are a limited number of Treasury direct accounts. So those exist. The accounts that the people who are promoting the bills of exchange are talking about are these UCC security accounts. And we provided testimony from an expert who acknowledged clearly that these do not exist. So by using the terminology of a direct account, she was basically indicating that he was passing a bad check, which was not truthfully the situation. And she was the only witness that testified to that. She was also the only witness – So, if I'm understanding right, you're saying that because direct accounts exist and these UCC-1 accounts don't exist, Mr. Butz's statements about drawing on one rather than the other would tend to – absent that evidence, it would negate one of the elements in his conviction? Or what – I'm not sure. Could you draw the line there? That bolsters his good-faith defense. Because he was telling people, no, you can't – there is no such – you can't draw on a Treasury direct account. He testified to that during the course of the proceedings. And that was always his position. You can't do that because those accounts are held in a different place, I think was the way he looked at it. But we do have access to these other accounts. So by indicating that they – that you could – her indicating that his – that he was advocating that people use – try to get into Treasury direct accounts, that in essence made this a bad check case. And where he – as opposed to a case where he honestly believed, falsely, but he honestly believed that these bills of exchange would allow people to access these other type of accounts. But again, he honestly believed existed, even though that belief may not have been accurate. It was based on his personal good faith. But as it turns out, honest belief is not a defense? No, we were – we were given a jury instruction that if the jury found good faith on the part of the defendants, that they could bring back a not guilty verdict. We got a good faith instruction. But let me ask you this then. This doesn't make any sense. Assume that the jury finds that the principals have acted not in good faith and they've gone ahead knowing that there's a problem. Well, as I understand the support for Mr. Butz's convictions, the argument is that he's an aider and a better. Now, is he an aider and a better whether he has good faith or not? Is good faith a defense to aiding and abetting someone who's not acting in good faith? We didn't address that issue at trial. I'm assuming that it must be because we got a good faith instruction. The reason I say I'm confused is repeatedly the district judge says, I think you honestly believed that this was okay. He keeps saying that to Mr. Butz. And obviously the district judge in his own mind thinks, well, he honestly believed that this was the real thing. He was deluded. But nonetheless, there's criminal liability. So several times the district judge says, I'm translating, but I don't think it's much of a difficult translation. You were acting in good faith, but you were deluded, but you go to jail. What's going on? Which is all the more reason for the court to remand based on my first argument for the I mean, the evidence simply didn't sustain the, even the judge found that. But of course the judge isn't, I mean, we've got a jury. So if you've got a defense, it goes to the jury that says, good faith is a defense. And the jury comes in with a, with a verdict against, I guess the jury didn't believe good faith. Maybe the judge believed him, but the jury didn't. You didn't argue the jury instructions, but I don't, I don't. Did the jury instructions include a good faith defense? Yes, it did. Okay. Yes. Well, my concern with allowing Ms. Schoenberg's testimony to stand is basically based on her plea negotiation with the government, she testified at trial that she pled guilty, and the jury was therefore given the information that this was basically a fraudulent process, that she engaged in it, and that in essence it was a boondoggle that nobody could have believed in. And this was directly contradictory to obviously Mr. Butz's and Mr. Schoenberg's position that they believed that these documents were valid. Was she the only one of the testifying witnesses who had pled guilty? Yes, she was. The other, there were several uncharged co-conspirators, but she and Mr. I'm sorry, I take that back. Mr. Kelton started the trial, I think just prior to openings, he then pled guilty and he also testified. And was the jury then aware that he'd pled guilty at the time that he testified? Yes. And I think when you're considering that, it's important to look at what Mr. Kelton's testimony was. He indicated that he prepared the documents using Steven Schoenberg's example, and the testimony was that he, Mr. Butz wasn't even involved in this until after the document had been tendered. And of course, you can't have aiding and abetting that only occurs after an incident. So again, part of the, when I was looking, when I've been preparing for argument, it's impressed me how much the first and the second argument sort of bleed together because of the inadequacy of the testimony of many of the witnesses, how crucial Rebecca Schoenberg's testimony was because of her directness, because of her position, and because of her experience with banking. I think the jury gave her testimony an incredible amount of weight. I had one last point. I wanted to save some time for rebuttal. However, I --- Why don't you make the point briefly, we'll hear from the government, and then we'll give you a chance to respond. Thank you. The point I wanted to make involved my third error concerning the departure variance argument. I would like to point out to the court that, well, there are two issues involved in that. One is whether this was a departure or a variance, and number two, even if it were a variance, if there should have been notice given. It's our position that this was not, that this was a departure rather than a variance. I think it's key that nowhere does the trial judge use the term variance, and just because the trial judge indicated reliance on 3553 factors does not mean that this did not involve the guidelines. Okay. You've got this pretty much set forth in the brief. Let's hear from the government, and then we'll give you a chance to respond. Thank you. May it please the Court, William Fitzgerald on behalf of the United States. It appeared from the questions for Ms. Shepard that the Court was interested in the issue of good faith, and the answer to the Court's question as to whether or not good faith was a defense is yes. If the jury had believed that Barton Buehler was a judge, and if the jury had honestly believed, and this is key, honestly believed in what he was saying about these bills of exchange, then they would have acquitted, and they would have been instructed to do so under the jury instruction. Was I misreading what the district judge said? No, I think that Judge Panner did make some comments along the lines of what you noted, Judge Fletcher. So if he'd been on the jury, we might have had an acquittal? Exactly. I think what Judge Panner was saying, though, is that the jury made its decision after Barton Buehler testified. The jury was in a position to assess his credibility and to make determinations as to whether or not he was actually acting in good faith, and he wasn't going to disturb that decision. I think in his mind, what he was saying was, maybe I disagree, but the question is whether any rational jury      I think that's what he was saying. Thank you. As to the other questions that the Court had, I'd like to correct one thing, and that is that there were three people who pled guilty prior to the trial. Rebecca Schoenberg pled guilty, Richard Akila pled guilty, and Stephen Kelton also pled guilty, and the jury knew about their guilty pleas. So all three of them testified, and the jury knew about the guilty pleas of all three of them? That's right. Okay. And the focus in the government's response to the defense arguments surrounding, you know, Rebecca Schoenberg's psychiatric evaluation, the withdrawal of her guilty plea, the response there is that, number one, it was merely impeaching, and, number two, that there was sufficient corroboration in the record to establish that there would not have been an acquittal had her testimony been completely discounted. So the corroboration existed on several fronts. She testified that she attended a seminar on redemption in which Barton Buttes addressed the crowd. Richard Akila testified to those same facts, as did Stephen Kelton. She testified that she went to U.S. Bank with Richard Akila. Akila testified to the same. Tony Crippen also corroborated. Tony Crippen was the bank officer who had worked with Rebecca Schoenberg. She corroborated Rebecca Schoenberg's account of visiting the bank. There was corroboration as to what happened afterwards. There was a 15-day waiting period which the bank was considering whether or not to accept these trade acceptances. Both she and Akila testified as to the 15-day waiting period. There was a 44-day. Oh, I'm sorry. I'm sorry. How important was the testimony from Rebecca Schoenberg about the use of direct accounts rather than the other sort of accounts in that testimony that apparently only Rebecca Schoenberg provided? Judge Acuda, I'm glad you asked that question because it reminds me that that was another issue that the Court was concerned about. And I believe that if the simple answer to that question is UCC contract accounts and Treasury direct accounts were both discussed during the trial. Barton Butte's position was that the UCC contract trust accounts existed and were the source of funds upon which somebody could extinguish a debt. The jury listened to that testimony. They disbelieved that testimony. There were two experts who testified, both of which said these UCC contract trust accounts do not exist. Therefore, the Treasury direct accounts, UCC contract trust accounts, it wouldn't have mattered, bad check. I think the analogy that Ms. Shepard makes to a bad check is apropos. And so the jury was in the best position to assess the evidence coming from Mr. Butte's lips as well as from the lips of the experts. They flat out rejected the notion that a UCC contract trust account existed. And so it was a red herring. Okay. Can I ask you about sufficiency of the evidence, not as to all the counts, but as to count 11, the Rasmussen count? And as you know, the clerk's office asked you, I'm not sure which of you ended up providing it, the transcript of Rasmussen's testimony, which we didn't get in the excerpts and apparently didn't quite make it into the district court record as it gets to us. I've now read her testimony. I have trouble seeing that there's sufficient evidence in her testimony to support count 11, count 11 being specifically directed to the 2 Lees Company. There's lots of testimony as to lots of things. And if you, for example, indicted as to the Lutzes, I think there's clearly enough to convict him. But could you help me? I'm inclined to think you don't have enough evidence of aiding and abetting as to 2 Lees. I do understand the Court's question. And as to that particular count of the indictment, admittedly, the government was thin. But I believe that I could point to a couple of facts that I argued to the jury, I believe, and are in the record. Well, put my nose in the evidence that you think supports the indictment as to the Lees. I will do that. Government Exhibit 18 was the bonded bill of exchange order. And where do I find that in my excerpts? That is located in Excerpt of Record 225. 225. Okay. The language in Government Exhibit 18 says about a quarter of the way down the form, it says, no later than 15 days after receipt, please credit the account for Marcia Gail Rasmussen at 2 Lees Company. So clearly, she signed this document with the intent of purchasing the mobile home that she testified about during her testimony. I have no difficulty as to whether Rasmussen might have done it. My question is aiding and abetting by Mr. Buttes. And there I would point to a couple of facts. One is that Buttes took her money. It wasn't much money, but she said she gave him $30. Took her money when and in connection with what? She took her money. He took her money before he gave, before he rendered assistance to her, essentially. She gave him a gift. Put my nose in the evidence, please. Your Honor, I would look to Excerpt of Record 137 and 138. Okay. Hang on a second. Okay. Let's see. What am I looking at? Excerpt of Record. 137, 138. 137, 138, where she's talking about consulting with Barton Buttes. Oh, this is Rasmussen's testimony. Yes. Oh, okay. Could you give me the page number of the testimony, if you have it there? Because mine is not – does not have the excerpt of record's numbers on them. The page number of the testimony, unfortunately, I don't have that here, but I have it. It's 12. ER 137 is the same as 12. Yes. And in that three or four pages, starting with that page, she talks about consulting Mr. Buttes on the law. Yeah, but she's talking entirely about the Lutz transaction. Well, was there evidence that his advice and counsel was ongoing throughout all of her adventures? That was certainly the – that was certainly what I recall from her testimony. Now, I don't want your recollection of the testimony. I want the testimony itself. Yes. And what you're pointing us to here is specifically – she is specifically directing her testimony to what he said to her during the Lutz transaction. Well, that is certainly – I understand how the Court is reaching that conclusion based on what it's seeing in the transcript. But I would say that she was – she was – she talked about an ongoing conversation with Mr. Buttes. Where? I'm going to refer to my brief. How about looking at line 21? So I would call him and ask him, when it says this, what do I put on this line? He'd say, what it's asking for is your name. What line are you talking about? Is that what you're talking about? There's that line, Judge Bea. There's also Ms. Shepard's questions as to, did he actually help you fill out the bills of exchange? No, he didn't. I would call and ask him questions. He was very good about that. He was very good at telling me what the law said. Yes. But let me back up to the line on page – lines on page 12 that Judge Bea just was referring to. Which were the lines that you were referring to? On the previous page, we're talking about, yes, the money had to come out of the Treasury account. Went to the Lutses account. The bank paid it. Why didn't you get the money? Because the Lutses didn't get their money. They didn't get paid. Well, the money was placed in their account but withdrawn. I'm now at the top of page 12. By whom? Debt that I didn't go through. I would say I went through. Yes, they didn't get the property. That's right. Were you in communication with Mr. Buttes at all during this process? Yes. Uh-huh. Well, tell the jury about that. What were you asking? In other words – and then she says, I was asking a lot of questions. During this process, we're talking about the Lutses. Do you agree with that? I agree with that. Is that how you read that? I agree with that. Do we have any testimony by her as to communications during the two-lease process? Specifically, specific communications that took place prior to passing that, no. But I would point to one other point of corroboration. That is, if you look at the bill of exchange itself that she passed and you compare that to the bill of exchange that was passed by Mr. Kelton – Let me ask you a different question. I understand this is kind of coming out of left field, but I'm trying to understand, in a sense, just general aiding and abetting law. Let's say that I counsel you as to how to rob a bank, and I drive you to the bank, and you then rob the bank. Okay, I've aided and abetted. Yes. The next week, I'm on vacation, and you go rob another bank using the instructions that I've given you, but I don't know that you were planning to do it. Have I aided and abetted you in robbing the second bank? Only if you gave specific instructions in the form of – and I think I understand the Court's illustration. But I think in this case, what we're talking about – No, under the Court's illustration, you have not done that. Because even though I've taught you how to rob banks, nonetheless, I didn't aid and abet you on the second bank? You didn't know about it, and you had no way of knowing about it. And you didn't do anything to help. Well, I might have known about it, and I've taught you how to be a bank robber. I mean, what do bank robbers do? I mean, they rob more banks. I guess you didn't do anything to actually help the person. You see, what I'm trying to figure out is this clear evidence that he helped her, aided and abetted her with respect to the Lutzes. He's basically teaching her how to do it. But I see nothing that says in her testimony, or so far in any other evidence, that he aided and abetted her with respect to the Thulees. She's using the skills that he has provided. And if you'd indicted her as to the Lutzes, you've got him dead to rights. But you indicted her as to the Thulees. And I guess the better illustration that I would point to the Court is really once he provides the language that goes into this document. Once he's taught her how to rob the bank. Well, once he's, in essence, created this document for her, because she didn't come up with the document on her own. He creates the document for her. It becomes the same. It becomes contraband. It becomes much like a controlled substance. So to have a different hypothetical, because I was puzzling over this question as well, if I instruct someone about how to counterfeit money, I don't have to tell them as to each piece of money that they counterfeit. I don't have to have responsibility for it. But if then they go out, I teach them how to do $10 bills, and then they go and do $20 bills that I didn't know about, am I responsible for that as an aider and abetter? So how would you draw the line? This seems more like a counterfeiting case than a bank robbery case. Yeah, I think that's an accurate comparison. And I think that it's important here that it's really the same as a counterfeit instrument, and that since they're charged in a conspiracy to pass these instruments, that when you're talking about acts that are done by co-conspirators, you're essentially talking about ---- Here's what the indictment says. On or about March 5, 2003, Defendant Barton Albert Butz with intent to defraud did aid and abet M.R. Rasmussen to present, offer, and attempt to pass to Thule's company a false and fictitious instrument in the amount of $75,000. That sounds pretty precise. It sounds like more than he taught her how to do this, and then she went out and did it. It sounds like aiding and abetting specifically with respect to this transaction. That's the charge. It does. And it's based on the notion that he gave her the language, and then she essentially took the language, put it into this instrument, and passed the instrument. Those are the facts. I sure wish you would have indicted him on count 11, as the left says, because you've got him dead to rights on that one. Yes. And the jury was listening to all of the evidence and considered Mr. Butz's testimony and Ms. Rasmussen's testimony and found him guilty as to that count as well. So I believe that there's little time left, unless the Court has any further questions. I do have a question, and this is practical impact. If we were to hold, and I'm certainly not saying that we are, if we were to hold that there's insufficient evidence as to count 11, would that make any practical difference as to the sentence? No. Because? Because essentially what Judge Panner did was apply an economic reality test, which meant he didn't add up all of the bills in question, the total amount of the bills in question. By comparison, the amount of fraud involved, $75,000 is chicken feed. I mean, there's a lot more money going on than $75,000, which is the two lees. So in essence what he did was he applied that economic reality test and set the offense level there, and the $75,000 in this case wouldn't have made a difference as far as the sentence was concerned. And can we be sure of that? If we were to say, listen, count 11 is gone, we remand for resentencing if the judge deems a new sentence appropriate, can we be sure that he would say same deal? Well, I'm not Judge Panner, but I would say this, that there was another bill in there that was a $536,000 bill, and I think there was a $497,000. Much bigger than the $75,000. So reasonably certain that the result would be the same. Okay. Thank you. Ms. Shepard? Let's start with two minutes. Okay. Thank you, Your Honor. I just had two very brief points that I wanted to address. Mr. Fitzgerald has indicated that the issue involving Rebecca Schoenberg merely impacted her, was merely impeaching on her, and I would strenuously disagree with that. It went directly to her good faith belief, which is a part of an element of the defense, or a defense to one of the elements of the defense of the charge, and that, and as a co-conspirator, her mental state was probably even more important. She, in essence, recounted a portion of her testimony by withdrawing her plea, because she changed her position on her belief about these instruments, and I think that brings into call a somewhat higher standard, as indicated in the Krantz case. The second issue is I had also looked at the aiding and abetting issue in terms of potentially a bank robbery, and as to Count 11, you have Mr. Butte's not only being completely uninvolved in the situation, but there's actually testimony there that he advised her that those particular documents were illegal. And it's at page 13. No. As I read that testimony, we're still talking about the Lutzes. Okay. Well, I think it has a bearing on the other cases, too, indicating that she should not be tendering those type of documents. He's advising her. You know, you're walking right into this one. I mean, if you're going to use this as to Lee's, I don't know why he doesn't get to use ten lines earlier as to the two Lee's. Then I'll sit down and be quiet. Thank you. Okay. Okay. Thank both sides for your argument. The case of the United States v. Buttes is now submitted for decision, and we are in recess until tomorrow morning. Thank you. Thank you. Thank you.
judges: Fletcher W. , Bea, Ikuta